WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arthur Benavidez,<br><br>               Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>               Defendant. | No. CV-15-01765-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Claimant Arthur Benavidez's appeal of the Social Security Administration's decision to deny benefits. (Doc. 1.) For the reasons set forth below, the Court remands for further proceedings.

**BACKGROUND**

For a week in October 2010 and then for about a month thereafter during most of November 2010 and part of December 2010, Mr. Benavidez was hospitalized for unexplained fainting episodes. Those episodes were eventually diagnosed as being caused by orthostatic hypotension – a drop in blood pressure when standing—that was secondary to autonomic dysfunction caused by Mr. Benavidez's diabetes mellitus. *See, e.g., (*R. at 584) (10/27/10 discharge summary noting a discharge diagnosis of "orthostatic hypotension with autonomic insufficiency, likely diabetic."), (R. at 535) (12/16/10 Discharge summary diagnosing "profound refractory orthostatic hypotension presumably secondary to diabetic autonomic neuropathy") (R. at 530) (consult noting "he has refractory orthostatic hypotension felt due to autonomic dysfunction with his

diabetes"), (R. at 511) "So far, the working diagnosis has been autonomic dysfunction secondary to his diabetes mellitus." (R. at 529) "been felt by the Neurology Service to have autonomic dysfunction related to diabetes with his profound refractory OH." R. at 530 (Mr. Benavidez "has refractory [OH] felt due to autonomic dysfunction with his diabetes.").

As a result, as Mr. Benavidez acknowledges, his treatment plan was to receive continued high dose medications—apparently those medications being for diabetes and sinus tachycardia. Doc. 15 at 6, R. at 530, 536.

In May 2011, Mr. Benavidez applied for disability insurance benefits and supplemental security income, alleging a disability onset date of November 1, 2010. (R. 25.) He claimed that his disabling conditions were his orthostatic hypotension, his diabetes, his agoraphobia and his bipolar disorder. During the course of his claim evaluation, he had appointments in September 2011 with both Dr. Steingard and Dr. Fruchtman. He acknowledged in his appointment with Dr. Steingard that he had not been taking his medications for depression for seven months prior to their visit.

Thereafter, in October 2011, Mr. Benavidez began seeing treating physician Dr. Ravi Galholtra. He acknowledged to Dr. Galholtra that he had not been taking his diabetes medications for the past year.

Mr. Benavidez's claim was reviewed by physicians at the administration and denied both initially and upon reconsideration leading Claimant to appeal to an Administrative Law Judge ("ALJ").

The ALJ conducted a hearing on the matter on December 13, 2013. (R. 43–68.). By the time of the administrative hearing, Mr. Benavidez's orthostatic hypotension had improved so that he apparently no longer had need of assistance to ambulate.[1] But as it pertained to his qualification for disability, his counsel noted that, even though then

---

[1] Mr. Benavidez testified that any remaining difficulty in his ability to walk was not caused by his orthostatic hypotension but by his neuropathy which was also a complication of his diabetes. "I can, I can walk but it's just very, very painful, feels like needles in the bottom of my feet." R. at 52.

- 2 -

improved, his orthostatic hypotension "had certainly lasted over a year" from the time it began. He further claimed that Mr. Benavidez's lack of insurance had resulted in his recent inability to afford medications so that, despite its amelioration, his orthostatic hypotension had worsened some recently. (R. at 46).

More significantly, at hearing Mr. Benavidez based his disability claim on newly developed emotional impairments which included "auditory, visual and olfactory hallucinations, as well as significant depression, and probably most significantly anxiety and agoraphobia with panic disorder." Mr. Benavidez's attorney noted at hearing that "while we recognize that at least initially the emotional impairments weren't as significant, the orthostatic hypotension was certainly disabling and, and the improvement, I don't believe has restored the ability to work in that regard. But it—even if it has, Judge, the emotional impairments are independently disabling at this point, so a combination of impairments leading to a step 5argument, Your Honor." (R. at 47). Consistently with his attorney's summary, at hearing, Mr. Benavidez consistently testified that he initially left work due to the orthostatic hypotension, but presently the biggest problem in his inability to work was his inability to be out in public (agoraphobia). *Id.* at 48. The claimant also testified that he didn't get out of bed much mainly due to his depression, but also due to his orthostatic hypotension which still caused him to get dizzy and often faint when he lifted his arms above his shoulders. R. at 53. He did testify, however, that while he had not been on his medication for depression when he met with Dr. Steingard, he had, in the interim, qualified for mental health care benefits and was on his medication for depression which was of some help. R. at 50-51.

In evaluating whether the Claimant was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[2] (R. 25–36.) At step one the ALJ

---

[2] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income). Under the test:

determined that the Claimant had not engaged in substantial gainful activity since the alleged onset date. (R. 27.) At step two, the ALJ determined that the Claimant suffered from the following severe impairments: orthostatic hypotension ("OH"), sinus tachycardia ("ST"), and bipolar disorder with agoraphobia. (R. 27.) At step three, the ALJ determined that none of those impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments. (R. 28.)

At that point, the ALJ made a determination of the Claimant's residual functional capacity ("RFC"),[3] concluding that the Claimant could perform sedentary work as defined in 20 CFR § 404.1567(a). (R. 29.) The ALJ concluded that the Claimant was unable to perform any past relevant work, (R. 34), thus, the ALJ reached step five and determined that Claimant could perform jobs that exist in significant numbers in the national economy that met his RFC limitations. (R. 35.) Given this analysis, the ALJ concluded that Claimant was not disabled. (R. 36.)

The Appeals Council declined to review the decision. (R. 1–6.) The Council accepted the ALJ's statements of the law, the issues in the case, and the evidentiary facts, as well as the ALJ's findings and ultimate conclusions regarding whether Claimant was disabled. (R. 1–5.)

---

A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal quotation marks and citations omitted).

[3] RFC is the most a claimant can do despite the limitations caused by his impairments. *See* S.S.R. 96-8p, 1996 WL 374184 (July 2, 1996).

- 4 -

Claimant filed the complaint on September 3, 2015.[4] (Doc. 1.) The matter is now fully briefed. (Docs. 14, 15, 19.)

**DISCUSSION**

**I.     Legal Standard**

A reviewing federal court will only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

However, the ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). At the same time, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). The Court also may not "affirm the ALJ's . . . decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (emphasizing the

---

[4] Claimant was authorized to file this action by 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . .").

- 5 -

fundamental rule of administrative law that a reviewing court "must judge the propriety of [administrative] action solely by the grounds invoked by the agency" and stating that if "those grounds are inadequate or improper, the court is powerless to affirm the administrative action"). Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## II.   Analysis

On appeal Mr. Benavidez bases his claim for benefits on his physical impairments only. He no longer asserts, as he did at hearing that his principal disabling ailments were either his depression or his agoraphobia. See, e.g., (Doc. 15 at 4) ("this appeal will focus on the effects of Benavidez's physical impairments on his ability to perform sustained work activity."). Mr. Benavidez's claim thus centers on his orthostatic hypotension (OH).[5]

Mr. Benavidez asserts that the ALJ erred in two ways in denying his benefits: first, by improperly rejecting the medical assessment of Mr. Benavidez's treating physician, Ravi Galholtra, M.D.; second, by improperly rejecting Mr. Benavidez's subjective symptom testimony. (Doc. 15 at 1.)

### A.   Treating Physician Dr. Galholtra's Medical Opinion

Dr. Galholtra became Mr. Benavidez's PCP five months after Mr. Benavidez filed his instant application for benefits. Three months after Dr. Golholtra began treating him, on January 23, 2012, Dr. Galholtra filled out three check box questionnaires related to Mr. Benavidez's disability. In the first check-box questionnaire-- a Peripheral Neuropathy Residual Functional Capacity Questionnaire, (R. at 375-76)-- Dr. Galholtra noted that Mr. Benavidez has peripheral neuropathy which caused him limitations including postural hypotension. He also noted that Mr. Benavidez has a separate

---

[5] Although the ALJ found that Mr. Benavidez also suffered from diabetes mellitus, she found that "when the claimant complies with recommended treatment, it does not cause more than minimal functional limitations." R. 27. Mr. Benavidez does not appeal this determination, or assert that his diabetes directly renders him disabled.

1 diagnosis of orthostatic hypotension and that, while engaging in occasional standing or
2 walking Mr. Benavidez had to use a hand-held assistive device.  (R. at 376).

3 In the second check-box questionnaire, Dr. Galholtra noted that Mr. Benavidez
4 suffered from severe fatigue which prevented him from being able to sustain work on a
5 regular and continuing basis, and required him to nap once per day.  (R. at 378-79).

6 In the third check-box questionnaire, a Medical Assessment of Ability to Do Work
7 Related Physical Activities, Dr. Galholtra concluded that due to his diabetes and
8 orthastatic hypotension, Mr. Benavidez can:  lift less than ten pounds, stand or walk for
9 less than 2 hours in an 8 hour work day, sit less than six hours in an eight hour work day,
10 does not need a hand-held assistive device for ambulation,  can never climb and can
11 occasionally balance stoop, kneel, crouch or crawl, and occasionally has the ability to
12 perform specified functions with his right or left hand.  He notes environmental
13 limitations caused by Mr. Benavidez's orthostatic hypotension and diabetes. (R. at 380-
14 82.)

15 In her findings, the ALJ agreed that Mr. Benavidez had orthostatic hypotension
16 and the functional limitations she adopted are, in at least some cases, more limiting than
17 those assessed by Dr. Galholtra.  On the finding most significant to Mr. Benavidez's
18 argument on appeal, the ALJ's finding is actually more restrictive than Dr. Galholtra's
19 check-box opinion.  Consistent with the opinion of Dr. Fruchtman, the ALJ finds that Mr.
20 Benavidez can never stoop whereas Dr. Galholtra opined that Mr. Benavidez could stoop
21 "occasionally" during his employment.

22 The ALJ nevertheless found that Mr. Benavidez could perform the jobs of
23 document preparer or escort vehicle driver without stooping based on the testimony of
24 the vocational expert.

25 On appeal, Mr. Benavidez argues that during cross-examination, the vocational
26 expert actually renounced his opinion that these professions did not require stooping.
27 The Court has examined the transcript and does not find Mr. Benavidez's argument
28 persuasive.  On cross-examination the Vocational Expert testified that "it might happen"

that such a job might involve some stooping during the day, but at the end of his testimony the Vocational Expert reaffirmed to the ALJ that his testimony concerning the occupations available to Mr. Benavidez is consistent with the Dictionary of Occupational Titles, which indicates that the two professions listed above require no stooping. Thus, the ALJ could appropriately base her conclusion that Mr. Benavidez could be a document preparer or an escort vehicle driver on that opinion. Document Preparer, DOT No. 249.587-018 *available at* 1991 WL 672349 ("Stooping: Not Present—Activity or condition does not exist."); Escort Vehicle Driver, DOT No. 919.6663-022 *available at* 1991 WL 687886 ("Stooping: Not Present—Activity or condition does not exist"); *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (reviewing court should not substitute its judgment for that of the ALJ when there is more than one reasonable interpretation of the evidence).

To the extent that Mr. Benavidez asserts that Dr. Galholtra's opinions as to Mr. Benavidez's physical capacities prevent a finding of ability to perform even sedentary occupations, the ALJ provided a sufficient basis for discounting Dr. Galholtra's opinion. The ALJ either imposed the same or more restrictive capacities on Mr. Benavidez with the exception that, consistent with the opinions of examining physician Dr. Fruchtman and reviewing State Disability Doctor reviewers, the ALJ concluded that Mr. Benavidez was able to sit for six of eight hours in an eight hour work day,[6] that he was able to lift and carry 20 pounds occasionally and ten pounds frequently, and that he could frequently, as opposed to occasionally kneel and crawl.

The opinion of a claimant's treating physician is generally given more weight than the opinion of any other physician in the record. *See Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014). However, if the treating physician's opinion is contradicted, the ALJ must either determine how much weight to afford it through the imposition of certain factors provided in 20 C.F.R. § 404.1527(c)(2)–(6), or, the ALJ may reject the

---

[6] This was in accord with the opinions of examining physician Dr. Fruchtman. R. at 342.

- 8 -

1   opinion if he provides "specific and legitimate reasons that are supported by substantial
2   evidence" for doing so.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.
3   2008); *see Ghanim*, 763 F.3d at 1161.

4   As the ALJ notes, Dr. Galholtra knew when he filled out the questionnaires that
5   his patient had been non-compliant with his prescribed medications.  For example, in his
6   initial client visit with Mr. Benavidez on October 12  2011, Dr. Galholtra notes
7   "Mr. Benavidez presented in a wheelchair and had been diagnosed with [diabetes
8   mellitus] 'but has not been taking his meds' for over a year."   (R. at 31.).   Dr. Galholtra
9   determined that he needed to obtain Mr. Benavidez's treatment records from his previous
10  physician Dr. Cifuentes, and needed to restart him on "Metformin, ASA, Statin, ACE-I,
11  Bystolic for Tachycardia.  (R. at 349).  Two weeks later when he sees Mr. Benavidez
12  again Dr. Golholtra states that he still needs the records from Dr. Cifuentes and must
13  restart Mr. Benavidez on the above medications.  (R. at 346).

14  The ALJ also cites Dr. Galholtra's treatment records that post-date the
15  questionnaires which evidence that Mr. Benavides had repeatedly been uncompliant with
16  his diet and medications" and that his diabetes remained uncontrolled.  (R. at 31). (See,
17  generally, Ex. 32F pages 18/50, 20/50, 23/50, 25/50, 28/50, 30/50, 33/50, 35/50, 38/50,
18  40/50, 42/50, 44/50, 47/50,  and R. 347, 724, 732.).

19  In his briefing as it pertains to the related point of whether Mr. Benavidez's non-
20  compliance with his medications justifies the ALJ in discounting his symptom testimony,
21  Mr. Benavidez argues that there is no relation between his orthostatic hypotension and his
22  diabetes.  See, e.g., Doc. 19 at 4.  ("Any lack of treatment for Benavidez's diabetes is not
23  reasonably relevant to credibility of symptoms related to orthostatic hypotension.").  A
24  review of the record as a whole, however, demonstrates that this argument is simply
25  wrong.  The medical records are replete with the diagnosis that Mr. Benavidez's
26  orthostatic hypotension is secondary to his diabetes mellitus.   *See, e.g., (*R. at 584)
27  (10/27/10 discharge summary noting a discharge diagnosis of "orthostatic hypotension
28  with autonomic insufficiency, likely diabetic."), (R. at 535) (12/16/10 Discharge

summary diagnosing "profound refractory orthostatic hypotension presumably secondary to diabetic autonomic neuropathy." (R. at 530) (consult noting "he has refractory orthostatic hypotension felt due to autonomic dysfunction with his diabetes"), (R. at 511) "So far, the working diagnosis has been autonomic dysfunction secondary to his diabetes mellitus." (R. at 529) "been felt by the Neurology Service to have autonomic dysfunction related to diabetes with his profound refractory OH." R. at 530 (Mr. Benavidez "has refractory [OH] felt due to autonomic dysfunction with his diabetes."). Further, as Mr. Benavidez acknowledges, his treatment plan for his orthostatic hypotension was to receive continued high dose medications—but the record suggests that those high-dose medications were diabetes medications. Doc. 15 at 6, R. at 530, 536.

Further, at hearing, Mr. Benavidez's attorney acknowledged that Mr. Benavidez's orthostatic hypotension had benefited from his compliance with his medication and had only recently deteriorated due to his alleged inability to afford his medications. R. at 46 ("It's [Mr. Benavidez's orthostatic hypotension] worsened recently, Your Honor, due to the Claimant's lack of insurance and, therefore, inability to afford treatment and medication for that impairment."). Thus, Mr. Benavidez, and specifically his orthostatic hypotension benefited from treatment with which he had at least at times been non-compliant. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits," *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Although the ALJ did note from Dr. Galholtra's treatment records Mr. Benavidez's non-compliance with his medications and dietary plan, the ALJ did not specifically note the relation between Mr. Benavidez's diabetes mellitus and his orthostatic hypotension. As is demonstrated above, however, this relation is clearly established in the record, and the failure of the ALJ to explicitly state that connection when it is so repetitively stated in the record may be harmless error. The ALJ may look to the record as a whole when discrediting a treating physician's opinion, *Batson*, 359 F.3d at 1195.

Mr. Benavidez's non-compliance with his prescribed medications and diet is a legitimate basis on which the ALJ could have appropriately assigned less weight to the opinion of Dr. Galholotra—especially in light of his attorney's acknowledgment at hearing that medical compliance resulted in improvement in his OH symptoms. Under such circumstances it would not be error for the ALJ to give the greatest weight to examining physician Dr. Fruchtman as she did, R. at 34, nor to give some weight to the opinions of the other State Disability Determination Services doctors which accorded to Mr. Benavidez slightly more ability than did Dr. Galholtra in some of the diagnostic criteria. (R at 30, 32-33).[7]  *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001) (conflicting opinion of examining physician is substantial evidence and a sufficient reason to reject a medical opinion when it is based on an independent examination as Dr. Fruchtman's opinion was.)

At hearing, Mr. Benavidez testified, and his attorney also avowed, that Mr. Benavidez was currently receiving and taking his mental health medications through public health assistance and that such medications helped him. R. at 50-51. While he did not address whether he could obtain his diabetic or other medications for his orthostatic hypotension from public health assistance, Mr. Benavidez's attorney did state at the outset of the hearing that Mr. Benavidez's long term improvement in his orthostatic hypotension had recently declined due to his more recent inability to afford private health insurance. That, of course, does not address whether Mr. Benavidez was able to obtain the medication through a public health program or otherwise throughout the relevant period of his alleged disability. Nevertheless, "benefits may not be denied to a disabled claimant because of a failure to obtain treatment that the claimant cannot afford." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). There is in the

---

[7] Mr. Benavidez argues at some length in his brief that Dr. Galholtra's determination that he did not need a hand-held assistive device to walk, see R. at 30, may not have been inconsistent with a finding that he nevertheless needed such a device for balance. Yet, while this check-form answer by Dr. Galholtra is apparently inconsistent with another check-form response he gave on that same day, the ALJ did not use it to discredit the opinion of Dr. Galholtra in this respect. In fact, the ALJ determined that Mr. Benavidez "should use an assistive device for ambulation." R. at 29.

- 11 -

1 record evidence which the ALJ could construe to determine that Mr. Benavidez either may or may not have had access to his prescribed diabetes medications and dietary plans throughout the period of his noncompliance regardless of his ability to obtain private insurance. Nevertheless, the ALJ does not address this question. As a cautionary measure, therefore, the Court remands the case to the ALJ to determine what medicines and treatment he was taking for his orthostatic hypotension and if and when he had and/or continues to have access to such medication and treatment. *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007),  SSR 82-59 (explaining the criteria necessary to find a failure to follow prescribed treatment), *Byrnes v. Shalala,* 60 F.3d 639, 641 (9th Cir. 1995). (ALJ must make specific findings on medical non-compliance.)

The ALJ also at least mentions other legitimate bases for which she could have limited the extent to which she accepted Dr. Galholtra's opinion. For example, the ALJ notes that the purported opinions of Dr. Galholtra are given in check box questionnaires. R. at 30 ("Ravi Galhotra (sic) M.D. completed 'check-mark' questionnaries in January 2012 noting the claimant's [diabetes mellitus] and [orthostatic hypotension.]") Check-mark questionnaires provide no explanation, justification or clinical basis for their conclusions. As such they may be appropriately rejected or limited by the ALJ. "We have held that the ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (internal quotation marks, modifications, and citation omitted). However, while noting that Dr. Galholtra's opinions are rendered in check-mark questionnaires, the ALJ does not explicitly state that this as a basis for limiting her acceptance of her opinions. We thus remand for a clarification of such statements.

However, the ALJ need not address the argument Mr. Benavidez raises for the first time in his reply brief that the ALJ did not provide adequate justification for rejecting Dr. Galholtra's conclusion that Mr. Benavidez was disabled due to his fatigue.

/ / /

/ / /

- 12 -

The Court does not consider arguments raised for the first time in the Reply brief.[8]  Even if it did, Dr. Galholtra's opinion that Mr. Benavidez is too fatigued to work is made in response to unexplained check mark questionnaires.  As *Molina* explains, that is a sufficient basis for the ALJ to reject it.  *Molina*, 674 F.3d at 1111.

Similarly, Mr. Benavidez did not originally raise fatigue as a basis for his disability claim, nor, when invited at hearing, did he include fatigue as a physical basis of his inability to work—he only mentioned his neuropathy.  *See, e.g.,* R. at 52 ("Q.  Do you have any physical pain or anything else physical that keeps you from working?  A.  Yeah.  I suffer from neuropathy due to the –my diabetes.").  The ALJ further noted inconsistencies between Dr. Galholtra's conclusion that he would need to nap daily, and Mr. Benavidez's statement to Dr. Steingard that he did not nap.  R. at 31, 34.  An ALJ is not required to accept a medical opinion when it is more extreme than the claimant's own testimony about his symptoms.  *See Sample v. Schweiker,* 694 F.2d 639, 643 (9th Cir. 1982) (ALJ properly found claimant's testimony that his mental impairment was ell controlled with medications more persuasive than doctor who opined that his mental condition was disabling) ; *Rollins v. Massanari,* 261 F.3d 853, 856 (9th Cir. 2001) (ALJ reasonably rejected medical opinion when claimant never claimed to have conditions that the doctor opined).

The ALJ listed other inconsistencies in what Mr. Benavidez told other physicians, and his capacity claimed in his disability application.  Due to the fact that Mr. Benavidez does not appeal the ALJ's determinations regarding any mental or emotional disabilities, many of those inconsistencies listed by the ALJ are less relevant.  To the extent that upon remand she intends to continue to rely on these inconsistencies to limit the extent to which she gives credence to Dr. Galholtra's opinions, she is invited to do so with greater specificity.   *See Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014), *Molina v.*

---

[8] In that portion of Mr. Benavidez's opening brief in which he summarizes Dr. Galholtra's check box responses to the questionnaires he does mention Dr. Galholtra's fatigue findings, but makes no argument concerning those findings. See, e.g., Doc. 15 at 7.

- 13 -

*Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012), *Brown-Hunter v. Colvin,* 806 F.3d 487, 488-89 (9th Cir. 2015).

The Court thus remands for the ALJ to make a finding as to whether Mr. Benavidez has asserted that he did not have access to treatment or his medications for his orthostatic hypotension and sinus tachycardia during the periods in which he was not compliant with his medication or treatment plan, whether these explanations are credible, and whether, in light of these explanations he has brought a successful disability claim based on his orthostatic hypotension and sinus tachycardia.

### B.  Claimant's Credibility

Of course, to the extent the ALJ concludes that Mr. Benavidez was able to, but did not follow his recommended treatment course, including taking his prescribed medication, that is in and of itself sufficient reason to discount the extent of his symptom testimony. The Ninth Circuit has "long held that, in assessing a claimant's credibility, the ALJ may properly rely on unexplained or inadequately explained failure . . . to follow a prescribed course of treatment." *Molina*, 674 F.3d at 1113 (internal quotation marks and citation omitted).  Social security rules also explain that an "individual's statements may be less credible if the . . . medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p.

It is not apparent to this Court that the statement by Mr. Benavidez's attorney prior to hearing that his client's orthostatic hypotension had worsened due to his recent inability to afford the medication explains his previous failures to take his medication. Nevertheless, in light of the remand that is already ordered by the Court on this issue, the Court invites the ALJ to determine whether Mr. Benavidez's apparent longstanding non-compliance with his treatment and dietary orders may be adequately explained.  If she determines that it cannot, then she has already sufficiently documented his long-standing failures to comply with medication sufficient to discount his symptom testimony.

/ / /

- 14 -

Further, the Court rejects Mr. Benavidez's assertion that the ALJ wrongfully rejected "his testimony relative to orthostatic hypotension, regarding his need to lie down the majority of a typical day . . . ." Doc. 15 at 17, *see also* Doc. 19 at 1. While Mr. Benavidez did testify at hearing that his inability to get out of bed was in part caused by the "the possibility of [his] fainting" when he raised his arms over his shoulders, he also attributed it in main part to his depression.

> A. I'm not able to lift my arms above my shoulders –
> Q. And why is that?
> A.  –or my—that—with the orthostatic hypotension the blood—once I do the blood starts to, to drain from, from my upper extremities and I get very dizzy and I faint quite often.
> Q. How do you spend your day?
> A. Pretty much watching a lot of TV, listening to the radio. I don't get out of bed much.
> Q. What keeps you in bed?
> A.  The – well, both things, the, the –the possibility of me fainting, and then the depression. I mean, it's just—it's – it's—that's the main thing.

R. at 53.

As he testified at hearing, Mr. Benavidez was assisted by, and was actively taking his medication for depression. R. at 50-51. The ALJ could have concluded based on his testimony, that Mr. Benavidez was not disabled by his depression when medicated. In any event, Mr. Benavidez based his appeal to this Court only on the Court's finding concerning his physical, and not his alleged mental or emotional disabilities.

To the extent that at his hearing Mr. Benavidez testified that the depression was "the main thing" that prevented him from getting out of bed, he cannot now recast his testimony to say that the whole reason he couldn't get out of bed was the possibility of his fainting when he held his arms over his shoulders. Quite simply that was not his testimony. Accordingly, he cannot now argue on appeal to this Court that the ALJ erred in not completely crediting his symptom testimony, when he does not appeal the ALJ's rejection of the basis that he himself identified to be one of its main causes.

1   The ALJ listed other inconsistencies in the applicant's testimony concerning the extent of his symptoms, but due to the fact that Mr. Benavidez does not appeal the ALJ's determinations regarding any mental or emotional disabilities, many of those inconsistencies listed by the ALJ are less relevant.  To the extent that upon remand she intends to rely on these inconsistencies to discredit the extent of  Mr. Benavidez's symptom testimony, she is invited to do so with particularity.   *See Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014), *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012), *Brown-Hunter v. Colvin,* 806 F.3d 487, 488-89 (9th Cir. 2015).

### C.    Remedy

The Ninth Circuit applies the "three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits[.]" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014).  The Claimant must establish:  first, that the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether medical opinion or claimant testimony; second, that the record has been fully developed and further administrative proceedings would serve no useful purpose; and third, whether if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.  *See id.* at 1100–01 (citing *Garrison*, 759 F.3d at 1020).  If all three conditions are met, the reviewing court may remand for an award of benefits. *Id.* at 1101.   Nonetheless, the reviewing court retains flexibility in determining the appropriate remedy if the record as a whole still creates "serious doubt as to whether the claimant is, in fact, disabled[.]"  *Id.* at 1107 (citing *Garrison*, 759 F.3d at 1021.)

In this case, the ALJ provided legally sufficient reasons for rejecting Dr. Galholtra's testimony and for finding the Claimant less than credible.  Nevertheless, in light of the possible suggestions in the record that Mr. Benavidez was unable to follow his treatment plan at times, this Court remands for the ALJ to examine that possibility.

Further administrative proceedings would thus be useful.   *Id.* at 1103.   Importantly, "assess[ing] whether there are outstanding issues requiring resolution [must

- 16 -

be done] *before* considering whether to hold that the claimant's testimony is credible as a matter of law." *Treichler*, 775 F.3d at 1105 (citation omitted).

Where, as here, there are matters of record that raise legitimate questions regarding the extent of the Claimant's impairment, the Court cannot reach the third and final credit-as-true step. *Dominguez*, 808 F.3d at 409; *Treichler*, 775 F.3d at 1105. Accordingly, further administrative proceedings would serve a useful purpose and are necessary. *Treichler*, 775 F.3d at 1105. The matter must therefore be remanded for further proceedings before the ALJ. *See, e.g.*, *Dominguez*, 808 F.3d at 409; *Treichler*, 775 F.3d at 1105; *Andrews*, 53 F.3d at 1039 (The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities). While it does order remand, the Court nevertheless finds for the reasons explained above that the Commission's decision was substantially justified. It therefore orders no attorneys' fees to be awarded.

## CONCLUSION

For the foregoing reasons, the Court remands the matter back to the ALJ to make additional determinations.

**IT IS THEREFORE ORDERED** directing the Clerk of Court to remand this matter back to the ALJ to make additional determinations. This matter is closed and the Clerk of Court is directed to enter judgment accordingly.

Dated this 29th day of September, 2016.

*/s/ G. Murray Snow*
Honorable G. Murray Snow
United States District Judge